**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| YASMIN ENCARNACION, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BERRY, DUNN, MCNEIL & PARKER LLC, and RELIABLE NETWORKS of MAINE LLC<br><br>Defendants. | Case No. ____________________<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Yasmin Encarnacion ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class" or "Class Members," as more fully defined below), brings this class action against Defendants Berry, Dunn, McNeil & Parker LLC and Reliable Networks of Maine LLC (collectively, "Defendants"). Plaintiff makes the following allegations upon personal knowledge as to her own acts, upon information and belief and their attorneys' investigation as to all other matters, and alleges as follows:

## INTRODUCTION

1. This action arises out of a targeted cyberattack and data breach caused by Defendants' failure to secure and safeguard Plaintiff's and over 1.1 million other individuals' personally identifying information ("PII") including names, Social Security numbers ("SSNs"), dates of birth, addresses, and individual health insurance policy numbers.[1]

[1] Office of the Maine Attorney General, Data Breach Notifications: Berry, Dunn, McNeil & Parker, LLC https://apps.web.maine.gov/online/aeviewer/ME/40/f51173b0-8935-424e-871a-08e64c147b2e.shtml (reporting 1,107,354 affected individuals) (last accessed May 1, 2024).

2. Defendant Berry, Dunn, McNeil & Parker LLC ("BerryDunn") is "a leading national professional services firm providing assurance, tax, and consulting services to businesses, nonprofits, and government agencies throughout the US and its territories."[2] As part of the professional and financial services it provides, BerryDunn collects and stores the PII of its clients' customers and patients, including the PII of Plaintiff and Class Members.

3. Defendant Reliable Networks of Maine LLC ("Reliable") is a technology services provider, [3] and a vendor contracted by BerryDunn. In that capacity, Reliable managed systems on behalf of BerryDunn.

4. On September 14, 2023, BerryDunn was notified by Reliable that between approximately September 12, 2023 and September 14, 2023, an unauthorized third-party gained access to Defendants' networks and systems (the "Data Breach").[4] These networks housed PII stored on BerryDunn's Health Analytics Practice Group's systems.[5]

5. Upon learning of the vulnerability, Defendant BerryDunn "immediately implemented" an incident response protocol and engaged cybersecurity experts "to assist with determining what occurred and whether any data was compromised."[6]

6. These cybersecurity experts confirmed for Defendant BerryDunn that an unauthorized actor gained access to Defendant Reliable's network and took data stored on

[2] https://www.berrydunn.com/about (last accessed May 1, 2024).
[3] https://www.reliablenetworks.com/ (last accessed May 1, 2024).
[4] Office of the Maine Attorney General, Data Breach Notifications: Berry, Dunn, McNeil & Parker, LLC https://apps.web.maine.gov/online/aeviewer/ME/40/f51173b0-8935-424e-871a-08e64c147b2e.shtml (last accessed May 1, 2024).
[5] *Plaintiff Yasmin Encarnacion's Notice of Data Breach*, Dated April 25, 2024 (hereinafter "Plaintiff's Data Breach Notice")
[6] Office of the Maine Attorney General, Data Breach Notifications: Berry, Dunn, McNeil & Parker, LLC (attached template Notice of Data Security Incident to affected Maine Residents) (last accessed May 1, 2024).

BerryDunn's Health Analytics Practice Group's systems. After learning this, BerryDunn hired a second vendor to "conduct an in-depth review of the impacted data to determine what personal information may have been impacted and identify any individuals for whom the personal information belongs."[7]

7. That secondary review was completed on April 2, 2024. At that time BerryDunn determined that Plaintiff's and Class Members' names, addresses, Social Security numbers, dates of birth, and individual health insurance policy numbers were compromised in the Data Breach.

8. Defendants did not notify Plaintiff and Class Members that their highly sensitive PII had been compromised in the Data Breach until on or about April 25, 2024, over seven months after the unauthorized third party gained access to Defendants' systems and to the PII of Plaintiff and the Class.[8]

9. Defendants owed a duty to Plaintiff and the other Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure.

10. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII of individuals stored on BerryDunn's Health Analytics Practice Group systems from unauthorized access and disclosure. For its part, BerryDunn also failed to adequately supervise the vendors with which it contracted—including Reliable Networks—to ensure those vendors were properly securing the PII of BerryDunn clients entrusted to BerryDunn, to the extent the PII entrusted to it was stored on third party networks.

---

[7] *Id.*

[8] Plaintiff's Data Breach Notice.

11. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and the other Class Members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII was exposed as a result of the Data Breach, which occurred between approximately September 12, 2023, and September 14, 2023.

12. Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence per se, and unjust enrichment, breach of implied contract, breach of fiduciary duty, and state statutory law, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### A. Plaintiff

13. Plaintiff Yasmin Encarnacion was and currently is a citizen of Reading, Pennsylvania at all relevant times. Plaintiff Encarnacion received Defendant BerryDunn's Notice of Data Breach letter over seven months after the Data Breach occurred, in late April 2024.

14. The Notice of Data Breach informed Ms. Encarnacion that the PII compromised in the Data Breach might include a combination of her name, address, Social Security number, date of birth, and individual health insurance policy number.[9]

15. Prior to this Data Breach, Plaintiff Encarnacion took great care to protect her PII and monitored her PIII closely. She has not knowingly transmitted her PII over unsecured or unencrypted internet connections.

[9] Plaintiff Encarnacion's Notice of Data Breach.

16. As a direct result of the Data Breach, Plaintiff Encarnacion has suffered injury and damages including, without limitation, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; loss of the potential value of her PII; and overpayment for services that did not include adequate data security.

17. Since learning about the Data Breach, in an effort to mitigate the risk, Plaintiff Encarnacion has spent time and effort reviewing her financial statements and identity theft protection reports to detect and prevent identity theft. Plaintiff has suffered and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the theft and compromise of her PII. Plaintiff will continue to spend additional time and incur future economic costs associated with the detection and prevention of identity theft. This is valuable time that Plaintiff Encarnacion would have otherwise spent on other activities, including but not limited to work and/or recreation, and which Plaintiff Encarnacion can never get back.

**B. Defendants**

18. Defendant BerryDunn is a corporation with its headquarters located at 2211 Congress Street, Portland, Maine 04102.

19. Defendant Reliable is a corporation headquartered at 477 Congress Street, Portland, Maine 04101.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because there are 100 or more Class Members, Plaintiff and at least one Class Member is a citizen of a state that is diverse from at least one Defendants' citizenships, and the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

21. This Court has personal jurisdiction over Defendant BerryDunn because BerryDunn has its principal place of business in this District and conducts significant business in this District.

22. This Court has personal jurisdiction over Defendant Reliable because Reliable has its principal place of business in this District and conducts significant business in this District.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because BerryDunn and Reliable have their principal places of business in this District, and a substantial part of the events giving rise to Plaintiff's claims arose in this District.

## FACTUAL ALLEGATIONS

### A. Overview of Defendants

24. Defendant BerryDunn's website claims that it is "a leading national professional services firm providing assurance, tax, and consulting services to businesses, nonprofits, and government agencies throughout the US and its territories."[10]

25. As part of the professional financial and accounting services it provides, BerryDunn contracts with healthcare providers nationwide. In that capacity it collects and stores the PII of its clients' customers and patients, including the PII of Plaintiff and Class Members.

26. Defendant Reliable is an information and technology services provider. Reliable's website claims that it is: "a team of experienced engineers dedicated to the success of your companies use of technology! We focus on your IT needs so you don't have to!"[11]

27. While providing technology consultation services, on-demand IT support and training, and maintenance and monitoring services, Reliable manages the networks of its clients

[10] https://www.berrydunn.com/about (last accessed May 1, 2024).
[11] https://www.reliablenetworks.com/ (last accessed May 1, 2024).

like BerryDunn, including those containing the highly sensitive PII of individuals like Plaintiff and Class Members.

28. In the ordinary courses of their business practices, Defendants store, maintain and use Plaintiff's and Class Members PII including, but not limited to, their names, Social Security numbers, dates of birth, addresses, and individual health insurance policy numbers.

29. Defendants understand the importance of securely maintaining PII.[12]

30. By obtaining, collecting, using, and deriving benefit from Plaintiff's and Class Members' PII in the ordinary courses of their businesses, Defendants assumed legal and equitable duties to the Class, and knew or should have known they were responsible for protecting the Class's PII from unauthorized disclosure and/or targeted criminal hacking.

**B. The Data Breach**

31. On September 14, 2023, Defendants learned that its networks containing Plaintiff's and Class Members' PII were compromised.

32. Between approximately September 12, 2023 and September 14, 2024, "an unauthorized actor gained access to" Defendants' networks. These networks housed Plaintiff's and Class Members' highly sensitive PII, including their full names, dates of birth, and Social Security numbers—information which makes them especially vulnerable to identity theft and other harm.

---

[12] https://www.reliablenetworks.com/about/ ("We work with our clients to ensure that their mission-critical applications are available to end users in a reliable, secure, and cost-effective manner, while also protecting their networks with the most up-to-date network security, backup, and disaster recovery solutions, as well as access to our engineers when they need it") (last accessed May 2, 2024); https://www.berrydunn.com/notice-of-reliable-networks-security-incident ("We take very seriously the need to protect the privacy and security of all information in our respective care, and deeply regret any inconvenience or concern that this matter may cause.") (last accessed May 2, 2024).

33. Specifically, according to the Notice of Data Security Incident sent to Plaintiff and Class Members the information compromised in the Data Breach included names, dates of birth, addresses, Social Security numbers, and individual health insurance policy numbers.[13]

34. Despite learning of the Data Breach in September 2023, Defendants waited until late April 2024—over seven months after Defendants initially detected the suspicious network activity—to notify affected individuals.

35. Moreover, to date, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken to ensure a breach does not occur again have not been shared with regulators or the Class.[14] Yet, the Class has a continuing interest in ensuring that their information is properly protected moving forward.

36. Defendants' failure to promptly notify Plaintiff Encarnacion and the other Class Members that their PII was accessed and stolen allowed the unauthorized third parties who exploited those security lapses to monetize, misuse, or disseminate that PII before Plaintiff Encarnacion and the other Class Members could take affirmative steps to protect their sensitive information. As a result, Plaintiff Encarnacion and the other Class Members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

---

[13] Plaintiff Encarnacion's Data Breach Notice.

[14] Indeed, Defendants are pointing the finger at one another, which makes it impossible for Plaintiff and the Class to determine the root cause of the Data Breach and whether the responsible parties are taking the necessary steps – or any steps - to secure their PII moving forward. *Compare* BerryDunn's Webpage, https://www.berrydunn.com/ (with a website banner reading "Notice of Reliable Networks Security Incident. Learn More.") (last accessed May 2, 2024); *to* Reliable's Website, https://www.reliablenetworks.com/ (with a website banner reading "Statement: Berry Dunn Security Incident") (last accessed May 2, 2024); *see also* https://www.berrydunn.com/notice-of-reliable-networks-security-incident and https://www.reliablenetworks.com/berrydunn-breach/.

**C. Defendants Knew that Criminals Target PII**

37. At all relevant times, Defendants knew, or should have known, that the type of information they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and the other Class Members' PII from cyber-attacks that Defendants should have anticipated and guarded against.

38. It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[15]

39. PII is a valuable property right.[16] The value of PII as a commodity is measurable.[17] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[18] American companies are estimated to have spent over $19 billion on acquiring

---

[15] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[16] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[17] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[18] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[19] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

40. Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[20]

41. As a result of the real and significant value of this data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

42. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[21]

---

[19] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[20] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/

[21] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

43. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

**D. Defendants Fail to Comply with FTC Guidelines**

44. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

45. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[23]

46. The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

47. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[22] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[23] *Id*.

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

48. These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

49. Defendants failed to properly implement basic data security practices.

50. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

51. Defendants were at all times fully aware of their obligation to protect the PII of individuals entrusted in their care. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**E. Defendants Fail to Comply with Industry Standards**

52. As shown above, experts studying cybersecurity routinely identify businesses housing troves of personally identifying information as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

53. Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendants, including but not limited to; educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limitations on which employees can access sensitive data.

54. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

55. On information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

56. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber incident and, ultimately, causing the Data Breach.

**F. Theft of PII Has Grave and Lasting Consequences for Victims**

57. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[24] [25]

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 10, 2023).

[25] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

58. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[26]

59. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[27]

60. Theft of PII is even more serious when it includes theft of information like individuals' health insurance policy numbers, as here. Data breaches involving this sort of information can "leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[28] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[29] In warning consumers on the dangers of medical identity theft,

---

[26] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[27] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 10, 2023).

[28] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[29] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 26.

the FTC states that an identity thief may use this sort of PII "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [30]

61. Theft of Social Security numbers also creates a particularly alarming situation for victims because Social Security numbers cannot easily be replaced. To obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of her Social Security number. Thus, a new Social Security number will not be provided until after the harm has already been suffered by the victim.

62. Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[31]

63. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

---

[30] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 10, 2023).

[31] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [32]

64. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[33]

**G. Damages Sustained by Plaintiff and Class Members**

65. Plaintiff and the other Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future

[32] *See* Dixon & Emerson, *supra* note 34.

[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of potential value of their PII; and (viii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

66. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of a class defined as:

> **Nationwide Class:** All United States residents whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach;

and, a subclass defined as:

> **Pennsylvania Consumer Subclass**: All natural persons residing in Pennsylvania whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

67. Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

68. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

69. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The proposed Class is sufficiently numerous that individual joinder of all Class Members is impracticable. Indeed, the Class size is believed to be over 1.1 million individuals.[34] Class Members may be notified of the

[34] Office of the Maine Attorney General, Data Breach Notifications: Berry, Dunn, McNeil & Parker, LLC https://apps.web.maine.gov/online/aeviewer/ME/40/f51173b0-8935-424e-871a-08e64c147b2e.shtml (reporting 1,107,354 affected persons) (last accessed May 1, 2024).

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

1. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2), 23(b)(3), and 23(c)(4).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will also materially advance the litigation. Common questions of fact and law affecting Class Members include, without limitation:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and the other Class Members' PII from unauthorized access and disclosure;

b. Whether Defendants had duties not to disclose the PII of Plaintiff and the other Class Members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and the other Class Members' PII;

d. Whether an implied contract existed between Plaintiff and the other Class Members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Plaintiff's and the other Class Members' PII from unauthorized access and disclosure;

e. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and the other Class Members;

f. Whether Defendants breached their duties to protect Plaintiff's and the other Class Members' PII; and

g. Whether Plaintiff and the other Class Members are entitled to damages and the measure of such damages and relief.

70. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class Members' claims because Plaintiff and each of the other Class Members had their PII compromised in the Data Breach. Plaintiff and the other Class Members were injured

by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

71. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class Members who she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating data breach class action cases similar to this one, and Plaintiff intends to prosecute this action vigorously. Class Members' interests will be fairly and adequately protected by Plaintiff and her counsel.

72. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

73. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

74. Defendants owed a duty to Plaintiff and the other Class Members to exercise reasonable care in safeguarding and protecting the PII in their possession, custody, or control.

75. Defendants knew or should have known the risks of collecting and storing Plaintiff's and the other Class Members' PII and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that targeted healthcare providers that collect and store PII in recent years.

76. Given the nature of Defendants' businesses, the sensitivity and value of the PII they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems or their third-party vendor's systems and prevented the Data Breach from occurring.

77. Defendants breached these duties by failing to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII and by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII.

78. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII and by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and the other Class Members' PII to unauthorized individuals.

79. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and the other Class Members, their PII would not have been compromised.

80. Due to Defendant's conduct, Plaintiff and the other Class Members are entitled to credit monitoring. The PII taken can be used for identity theft and other types of financial fraud against the members of the Class.

81. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach. Annual subscriptions for credit monitoring plans can cost upwards of $300 per year.[35]

82. As a result of Defendants' above-described wrongful and negligent actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and the other Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of potential value of their PII; and (viii) overpayment for the services that were received without adequate data security.

83. These injuries were reasonably foreseeable to Defendants given the history of security breaches of this nature. The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendants' negligent conduct.

[35] E.g. Credit Monitoring Services: Are They Worth the Cost?, NerdWallet, https://www.nerdwallet.com/article/finance/credit-monitoring-identity-theft-monitoring (Dec. 20, 2023).

**COUNT II**
**NEGLIGENCE PER SE**
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

84. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

85. Defendants' duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as BerryDunn and Reliable, of failing to employ reasonable measures to protect and secure PII.

86. Defendants violated Section 5 of the FTCA by failing to, or contracting with companies that failed to, use reasonable measures to protect Plaintiff's and the other Class Members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtain and store, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

87. Defendants' violation of Section 5 of the FTCA constitutes negligence per se.

88. Plaintiff and the other Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

89. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and the other Class Members as a result of the Data Breach.

90. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and the other Class Members' PII to unauthorized individuals.

91. The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendants' violations of Section 5 of the FTCA. Plaintiff and the other Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of potential value of their PII; and (viii) overpayment for the services that were received without adequate data security.

## COUNT III
## UNJUST ENRICHMENT
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

92. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

93. Plaintiff and the other Class Members conferred a monetary benefit upon Defendants in the form of their valuable PII, which Defendants knowingly used or retained in the course of their ordinary business practices.

94. Defendants benefited from receiving Plaintiff's and Class Members' PII by their ability to retain and use that information for their own financial business benefits. Defendants understood this benefit and accepted the benefit knowingly.

95. Defendants also understood and appreciated that the PII of Plaintiff and the other Class Members was private and confidential to them, and that the value of that information depended upon Defendants maintaining the privacy and confidentiality of that PII.

96. Plaintiff and the other Class Members also conferred a monetary benefit upon Defendants in the form of monies paid to Defendants for services.

97. The monies paid to Defendants for services involving Plaintiff's and the other Class Members' PII were to be used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

98. As a result of Defendants' conduct, Plaintiff and the other Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and the other Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

99. Defendants should not be permitted to retain the money belonging to Plaintiff and the other Class Members because Defendants failed to adequately implement the data privacy and

security procedures for themselves that Plaintiff and the other Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

100. Plaintiff and the other Class Members have no adequate remedy at law.

101. Defendants should be compelled to provide for the benefit of Plaintiff and the other Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**BREACH OF CONTRACT**
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

102. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

103. This Claim is pleaded in the alternative to Count III above.

104. Defendants acquired and maintained the PII of Plaintiff and the Class that they received either directly or from its healthcare provider customers.

105. Plaintiff and the Class were required to deliver their PII to Defendants, indirectly, as part of the process of obtaining services provided by Defendants' clients (healthcare providers). Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

106. Defendants solicited, offered, and invited Class Members to provide their PII as part of their regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their PII to Defendants, or, alternatively, provided Plaintiff's and Class Members' information to doctors or other healthcare professionals, who then provided to Defendants.

107. Defendants accepted possession of Plaintiff's and Class Members' PII for the purpose of providing services or Plaintiff and Class Members.

108. In accepting such information and payment for services, Defendants entered into an implied contract with Plaintiff and the other Class Members whereby Defendants became obligated to reasonably safeguard Plaintiff's and the other Class Members' PII.

109. Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between Defendants and healthcare providers.

110. In delivering their PII to Defendants and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

111. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

112. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to PII also protect the confidentiality of that data; (2) restricting access to qualified and trained agents; (3) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (4) applying or requiring proper encryption; (5) multifactor authentication for access; and (6) other steps to protect against foreseeable data breaches.

113. Plaintiff and the Class Members would not have entrusted their PII to Defendants in the absence of such an implied contract.

114. Had Defendants disclosed to Plaintiff and the Class (or their healthcare providers) that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their PII to Defendants (or their healthcare providers to provide to Defendants).

115. Defendants recognized that Plaintiff's and Class Members' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

116. Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Defendant.

117. Defendants breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their PII as described herein.

118. As a direct and proximate result of Defendants' conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT V
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

119. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

120. This Claim is pleaded in the alternative to Count III above.

121. Defendants entered into a contract to provide services to Plaintiff's respective medical providers. Upon information and belief, this contract is virtually identical to the contracts entered into between Defendants and their other medical provider and insurance

customers around the country whose patients were also affected by the Data Breach which occurred on Defendant BerryDunn's *Health* Analytics Practice Group's systems.

122. These contracts were made expressly for the benefit of Plaintiff and the Class, as it was their confidential medical information that Defendants agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties.

123. Defendants knew that if they were to breach these contracts with their customers, the customers' patients, including Plaintiff and the Class, would be harmed by, among other harms, fraudulent transactions.

124. Defendants breached their contracts with the medical providers affected by this Data Breach when they failed to use reasonable data security measures that could have prevented the Data Breach.

125. As foreseen, Plaintiff and the Class were harmed by Defendants' failure to use reasonable security measures to store patient information, including but not limited to the risk of harm through the loss of their PII.

126. Accordingly, Plaintiff and the Class are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

127. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

128. A relationship existed between Plaintiff, the Class Members, and Defendants, which arose from Defendants' acceptance of Plaintiff's and the Class Members' PII and Defendants' representations of its commitment to protect said PII.

129. In providing their PII to Defendants, Plaintiff and Class Members justifiably placed a special confidence in Defendants to act in good faith and with due regard for the interests of Plaintiff and Class Members to safeguard and keep confidential that PII.

130. Defendants accepted the special confidence Plaintiff and Class Members placed in them, as evidenced by their assertion that they are committed to protecting the privacy of Plaintiff's personal information as included in the Data Breach notification letter.

131. In light of the special relationship between Defendants, Plaintiff, and Class Members, whereby Defendants became guardians of Plaintiff's and Class Members' PII, Defendants created a fiduciary duty by their undertaking the guardianship of the PII, to act primarily for the benefit of their customers, including Plaintiff and Class Members, for the safeguarding of Plaintiff's and Class Members' PII.

132. Defendants have fiduciary duties to act for the benefit of Plaintiff and Class Members upon matters within the scope of their customer relationships, in particular, to keep secure the PII of their customers, whether those customers are direct or indirect.

133. Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the systems containing Plaintiff's and Class Members' PII.

134. Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

135. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including, but not limited

to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the present and continued risk to their PII, which remains in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII in its continued possession and ensure that it retains vendors who adequately protect PII; (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (h) nominal damages.

136. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VII**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 PA. CONS. STAT. §§ 201-1, *et seq.***
***(On behalf of Plaintiff Encarnacion and the Pennsylvania Subclass against all Defendants)***

137. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

138. Plaintiff Encarnacion brings this claim on behalf of herself and the Pennsylvania Subclass against all Defendants.

139. Plaintiff and Pennsylvania Subclass Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

140. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

a. Representing that their goods and services have approval, characteristics, uses, or benefits that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

b. Representing that their goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201- 2(4)(vii)); and

c. Advertising their goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

141. Defendants' unfair or deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that they did not properly secure Plaintiff's and Subclass Members' PII; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

142. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

143. Defendants intended to mislead Plaintiff and Pennsylvania Subclass Members and induce them (or their healthcare providers) to rely on its misrepresentations and omissions.

144. Had Defendants disclosed to Plaintiff and Pennsylvania Subclass Members (or their healthcare providers) that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff and Pennsylvania Subclass Members. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Subclass Members acted reasonably in relying on Defendants misrepresentations and omissions, the truth of which they could not have discovered.

145. Defendants acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly

disregarded Plaintiff and Pennsylvania Subclass Members' rights. Defendants were on notice that its security and privacy protections were inadequate and had remained inadequate given the high number of data breaches that occur across major industries including the professional services sector in which Defendants operate.

146. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and the Pennsylvania Subclass Members' reliance on them, Plaintiff and Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services, directly or indirectly; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

147. Plaintiff and Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law, including, pursuant to 73 Pa. Stat. Ann. § 201-9.2, actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT VIII
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
***(On behalf of Plaintiff and the Nationwide Class against all Defendants)***

148. Plaintiff realleges and incorporates by reference all preceding factual allegations in paragraphs 1-65 as if fully set forth herein.

149. This count is brought on behalf of all Class Members.

150. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

151. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' PII, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Defendants have admitted that their data security measures remain inadequate as many key systems remain offline.

152. Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

153. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Defendants owe a legal duty to secure affected individuals' PII, and to timely notify impacted individuals of a data breach under, inter alia, the common law and Section 5 of the FTC Act, and (b) Defendants continue to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendants explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain

reasonable security and monitoring measures, including, but not limited to:

i. prohibit Defendants from engaging in the wrongful and unlawful acts alleged herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

v. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants systems on a periodic basis;

vi. prohibiting Defendants from maintaining Plaintiff's and Class Members' PII on a cloud-based database until proper safeguards and processes are implemented;

vii. requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants network is compromised, hackers cannot gain access to other portions of Defendants systems;

viii. requiring Defendants to conduct regular database scanning and securing checks;

ix. requiring Defendants to monitor ingress and egress of all network traffic;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xi. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants policies, programs, and systems for protecting personal identifying information;

xii. requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii. requiring Defendants to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

154. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at, or implicating,

Defendants. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

155. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

156. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiff as a Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from permitting another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 13, 2024

Respectfully submitted,

/s/Alexander E. Spadinger,

Alexander E. Spadinger, Esq.
Bar No. 765731
aspadinger@shaheengordon.com
Shaheen & Gordon, P.A.
P.O. BOX 977
DOVER, NH 03821
(603) 749-5000
***Local Counsel and Attorney for Plaintiff and the Proposed Class***

_/s/ James Pizzirusso_______________
James Pizzirusso*
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
jpizzirusso@hausfeld.com

Steven Nathan*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com

***Counsel for Plaintiff and the Proposed Class***

**Pro Hac Vice* applications forthcoming